IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| TERRENCE D. HENDERSON, ) <br> ) <br> Plaintiff, ) <br> vs. ) <br> ) <br> MICHAEL W. WYNNE, Secretary,[1] ) <br> Department of the Air Force, ) <br> ) <br> Defendant. ) | NO. CIV-04-1622-HE |

## ORDER

Plaintiff filed this lawsuit against the Secretary of the Air Force ("Secretary" or "defendant"), alleging race discrimination under Title VII of the Civil Rights Act of 1964 in conjunction with his application for a position at Altus Air Force Base ("Altus AFB"). The Secretary has filed a motion for summary judgment, contending plaintiff can neither state a prima facie case of discrimination nor establish that the articulated reason for his decision to withdraw a tentative offer of employment was prextextual.

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The evidence and any reasonable inferences that might be drawn from it are viewed in the light most favorable to the nonmoving party. Simms v. Okla. ex rel. Dep't of Mental Health and Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999). Having applied the Rule 56 standard to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law," Jeffries v. Kansas, 147 F.3d 1220, 1228 (10th Cir.1998) (internal quotation and citation omitted), the court concludes defendant's motion should be granted.

---

[1] *Michael W. Wynne has been substituted as the defendant for James G. Roche. He was confirmed as the Secretary of the Air Force in November 2005. See Fed.R.Civ.P. 25(d)(1).*

1

## BACKGROUND

The bulk of the pertinent facts are undisputed. They arise against the backdrop of the security procedures applicable to the hiring of employees at a military installation. In general, the hiring process starts with the extension of a tentative offer of employment. If the prospective employee does not have the necessary security clearance, the person must submit the paperwork necessary to obtain it. The level of security clearance required is determined by the nature of the job. As the security clearance determination process may take an extended period of time, appropriate managers are authorized to grant pre-employment waivers of the security requirements. Such waivers, if granted, permit a prospective hire to start work immediately without waiting for the completion of the security clearance determination.[2]

Here, plaintiff, while working as a human resources assistant at the Fort Sill Army Post, Lawton, Oklahoma, as a civilian employee, applied for a position as an aircraft mechanic at Altus AFB. He was advised orally that he had been selected for the position. On February 10, 2003, he met with Paula Willis, an Altus AFB human resources assistant, to pick up paperwork. Included in the packet was a Memorandum signed by Willis, dated February 10, 2003, stating that plaintiff had been "tentatively selected for the position ... pending satisfactory completion of pre-employment requirements." Defendant's Exhibit 3. The Memorandum stated that security clearance paperwork had to be completed and mailed by that office before a start date could be set. Plaintiff signed the Memorandum on March

---

[2]*See generally, Air Force Instruction 31-501, Chapter 3, Defendant's Exhibit 6. Sometimes referred to by the designation "AFI," these instructions implement the Department of Defense Personnel Security Program.*

2

1, 2003, acknowledging by his signature its receipt, that it was a tentative job offer only,[3] and that an effective date would not be set until verification of paperwork was complete and his eligibility for the position had been verified. He testified that Willis initially told him on February 10, 2003, that his signature was unnecessary because he was being transferred from one base to another under the Veterans' Recruitment Appointment ("VRA"), but later, after he had visited the base and met Eulis Mobley,[4] advised him his signature was required as a matter of procedure.

During his February 10 meeting with Willis, plaintiff showed her what he referred to as his security clearance from Tinker Air Force Base, where he had previously worked as an aircraft pneudraulic systems mechanic. That document, plaintiff's Exhibit 2, entitled a "Certification of Investigation," certifies "that a background investigation on the person identified above has been completed," that "[t]he results of this investigation were sent to the security office for a security/suitability determination," and that "the results of this investigation have been reviewed, and a final determination has been made." *Id.* The document was signed by the "agency certifying official" on July 10, 2001.

Not long after he met with Willis, plaintiff was called and given a start date of April 7, 2003, which was later changed to April 20, 2003. Plaintiff indicates he then called Mobley and scheduled a tour of the facility for late February, 2003. According to plaintiff, when he appeared for the tour, Mobley seemed surprised and shocked that plaintiff was black and

---

[3]*Plaintiff disputes that the offer was tentative, based on his being given a start date. However, the Memorandum specifically stated, above plaintiff's signature: "I acknowledge receipt of this letter and understand that this is a tentative job offer only, and that no effective date will be set until verification of all paperwork is complete and eligibility for the position has been verified." Defendant's Exhibit 3.*

[4]*Mobley was the Maintenance Directorate's liaison to the civilian personnel office. Plaintiff's Exhibit 13, pp. 40-41.*

refused to shake his hand.[5] Plaintiff asserts that after this incident he was asked to sign the February 10, 2003, Memorandum, submit an SF-86, and obtain a pre-employment waiver from the Director of Maintenance, Michael Bradley.

Plaintiff completed and submitted the SF-86. Eldon Stepp, Security Manager for the Maintenance Directorate, reviewed it and also checked the Joint Personnel Adjudication System ("JPAS"), the record system for personnel security information. According to Stepp, the check indicated that a National Agency Check and Inquiry ("NACI") pertaining to plaintiff was opened and closed in December 2000, but did not reflect that plaintiff had a clearance or that the investigation had concluded with any finding, favorable or unfavorable. Defendant's Exhibit 5, ¶ 13.[6]

Stepp sent Bradley a message dated April 14, 2003, stating that "Terence Henderson, who is scheduled to come on board on Monday the 21st, just turned in his security clearance package today. Although I did not see anything that would outright prevent him from obtaining a clearance, there are some things in it that you need to be aware of." Defendant's Exhibit 10. Stepp then noted, based on the information in plaintiff's SF-86, that plaintiff had filed for bankruptcy in 1996 ($60,000 debt), had been arrested for disorderly conduct in June 2001, that his wages were presently being garnished for $10,000 in back child support, and that a $6000 credit card debt to Conseco Finance and a $400 credit card debt to Providian had been written off in December 2002. He concluded with: "[t]hese items may not be enough to deny a clearance but the pattern of financial irresponsibility from June 1996 through 2002 to present will certainly lengthen the time it will take for the investigation.

---

[5] While Mobley denies this occurred, the court has accepted plaintiff's version of the facts for purposes of resolving defendant's motion.

[6] Plaintiff disputes this, stating that he had received a favorable security clearance on July 10, 2001.

4

OPM is going to want clear cut and in-depth answers to his financial problems." *Id.* Bradley, who states he was unaware of plaintiff's race, concluded a pre-employment waiver of security requirements should not be granted, stating "Doesn't seem like a good risk. Disapproved." *id.* Plaintiff was then advised that the job offer had been revoked. Plaintiff, an African-American, contends the offer was revoked because of his race.

## DISCUSSION

The McDonnell Douglas analytical framework guides the court's review of plaintiff's race discrimination claim.[7] Plaintiff must first establish a prima facie case. The burden then shifts to defendant to offer a legitimate, nondiscriminatory reason for its decision to revoke the employment offer or discharge him. If the Secretary comes forth with a facially nondiscriminatory reason, the burden reverts back to plaintiff to show that its explanation was pretextual. "Pretext can be shown by 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" Morgan v. Hilti, Inc.,108 F.3d 1319, 1323 (10th Cir. 1997) (quoting Olson v. General Elec. Astrospace, 101 F.3d 947, 951-52 (3d Cir.1996)).

Although the parties disagree as to whether this case should be viewed as one for failure to hire or for discharge, the distinction is not critical as the Court concludes a prima facie case has been made out in either event.[8] To establish a prima facie case based on

---

[7] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). "The *McDonnell Douglas* burden-shifting analysis is appropriate in ... discrimination cases such as the present one, in which the plaintiff has no direct evidence of discrimination and the employer disclaims reliance on the plaintiff's [race] for an employment decision." *Morgan v. Hilti, Inc.*, 108 F.3d 1319,1323 n. 3 (10th Cir. 1997).

[8] *In its analysis of the claim, the court will treat the adverse employment action as being a revocation of an offer of employment.*


failure to hire, a plaintiff must show that: (1) he belonged to a protected class; (2) he applied for and was qualified for a job for which the employer was seeking applicants; (3) despite being qualified, was rejected; and (4) after his rejection, the position remained open and the employer continued to seek applicants from persons with plaintiff's qualifications. Garrison v.Gambro, Inc., 428 F.3d 933, 937 (10th Cir. 2005) *Id.* at 937. In a discharge case, a plaintiff must show that (1) he belongs to a protected class, (2) he was qualified for his job, and (3) despite his qualifications, was discharged. Green v. New Mexico, 420 F.3d 1189, 1192 (10th Cir. 2005). Defendant concedes plaintiff was a member of a protected class and was qualified (subject to any applicable security requirements) to perform the work of an aircraft mechanic, but was denied (or, as plaintiff would have it, discharged from) the position. Neither party explicitly addressed the fourth element of the failure to hire scenario. Plaintiff asserts it can be established and defendant tacitly concedes it, so the Court concludes that element is sufficiently shown and that a prima facie case has been established. As defendant has articulated a facially non-discriminatory reason for revocation (the risk of an unfavorable security determination), the question then becomes whether plaintiff can bring forward evidence sufficient to create a question of pretext.

Plaintiff alludes to a number of occurrences or circumstances which he suggests constitute discrimination or which indicate the stated basis for revocation of the offer of employment was pretextual. In general, he contends there was no basis for defendant to require new security information from him or to require a pre-employment waiver of security requirements, as he already had a security clearance. He urges that the basis for the denial of the pre-employment waiver was improper and that other procedural improprieties occurred, all after the alleged incident with Mr. Mobley.

It is undisputed that the job plaintiff sought was designated as a "non-critical

6

sensitive" position.[9] The security clearance necessary for such a position required an ANACI investigation conducted by the Office of Personnel Management.[10] That investigation and the resulting clearance are to be based, in part, on information included in form SF-86.[11] Plaintiff's argument is that he already had the necessary security clearance.

The evidence is disputed as to whether plaintiff had a security clearance at all at the time he applied for the job in question. It is clear that an investigation was done in 2000. It is disputed, though, whether that investigation resulted in a formal determination or clearance.[12] The Court assumes, for present purposes, that plaintiff had some kind of clearance based on the 2000 investigation. However, the question is not whether plaintiff had a security clearance of some kind. Rather, the question is whether he had the particular security clearance required for the position he was seeking — a "non-critical sensitive" position. Plaintiff has come forward with no evidence to suggest that he had the particular security clearance required for such a position.[13] To the contrary, the Certificate of Investigation upon which he relies recites that investigation was based on form SF-85, a more

---

[9]*Air Force Core Document, Defendant's Exhibit 7. As with plaintiff's responses to certain other of defendant's claimed undisputed facts, plaintiff's general statement that he previously had a similar job and a security clearance does not serve to controvert this specific fact.*

[10]*AFI31-501, §3.3. ANACI stands for Access National Agency Check with Written Inquiries and Credit Check Investigation and is sometimes referred to as an "Access NACI."*

[11]*AFI31-501, §3.3; Plaintiff's Response to Request for Admissions No. 3, Defendant's Exhibit 3.*

[12]*As noted above, Mr. Stepp's check of the JPAS records did not reflect any formal determination or clearance. However, the Theiss affidavits, though questionable in various respects, suggest that the Certificate of Investigation (Plaintiff's Exhibits 2 and 20) either was, or at least reflected, a favorable security determination and are sufficient to create a factual issue as to whether plaintiff had some sort of security clearance.*

[13]*The same person upon whom plaintiff depends for verification of the existence of his security clearance, Mr. Theiss, also indicates plaintiff's prior clearance at Tinker AFB was for a "non-sensitive" position, rather than the "non-critical sensitive" position involved here. Exhibit 2 to Defendant's reply brief.*

limited inquiry, rather than form SF-86.[14] As plaintiff did not have the particular level of security clearance required for the position he sought,[15] it was necessary and appropriate for defendant to require and process the paperwork which related to the necessary clearance.

The issue then becomes whether defendant's refusal to grant a pre-employment waiver of the clearance requirement shows discrimination or pretext. As noted above, defendant's procedures permit a person lacking the necessary security clearance to start work, prior to completion of the security clearance process, if a pre-employment waiver is granted by the appropriate official. If a waiver is granted, the ANACI investigation is still conducted by the Office of Personnel Management ("OPM"). If the investigation does not result in the necessary clearance being granted, the employee who has been working in the meantime is removed from his or her position. If the waiver is not granted, the tentative offer of employment is withdrawn without the prospective employee ever entering on duty.

Here, the undisputed evidence is that Bradley was the official with the authority to make the waiver decisions for the Maintenance Directorate and that his practice was to make the waiver decisions based on information provided by Mr. Stepp, the Security Manager. Defendant's Exhibit 5, ¶8. Stepp reviews the completed SF-86 of an applicant who does not already possess the necessary clearance and consults with the Base Security Force to determine if any other information exists that the Director should consider in making his

---

[14]*See 32 C.F.R. §154.16, identifying various levels of clearance and the documents upon which they are based. Plaintiff's reliance on §154.16 and its authorization of use of the SF-85 in certain circumstances is misplaced. At most, the regulation authorizes the less intrusive form for interim clearances. However, even as to an interim clearance, there must be a favorable review of the SF-85 plus initiation of an NACI or similar investigation which, as noted previously, requires use of the SF-86.*

[15]*The difference in the scope of the two investigations renders 32 C.F.R. §154.24, upon which plaintiff relies, inapplicable: "[a]s long as there is no break in military/civilian employment greater than 12 months, any previous personnel security investigation conducted by DoD investigative organizations that essentially is equivalent in scope to an investigation under this part [will be accepted]" (emphasis added).*

decision. *Id. See* Defendant's Exhibit 6, p. 9, ¶3.3. He also checks the JPAS system for information on the applicant.

Bradley indicated that, in making the waiver decisions, his practice is to consider the likelihood of an employee ultimately receiving the necessary clearance and weigh that against the costs of a background investigation, the training time and costs for a new employee, and the disruption occasioned by the removal and replacement of an employee in the event of an unfavorable conclusion to the background investigation. Defendant's Exhibit 8, ¶8. Bradley also stated that, following the terrorist attacks of September 11, 2005, he has been particularly sensitive to financial and law enforcement problems when making his decisions. *Id. See* Green v. New Mexico, 420 F.3d 1189, 1191 n.2 (10th Cir. 2005) ("[A] challenge of pretext requires a court to look at the facts as they appear to the person making the decision to terminate, not the aggrieved employee."). Bradley indicates that, based on the information from Stepp, he concluded plaintiff was "not a good risk" and denied the waiver.

Plaintiff attempts to rebut defendant's explanation for the waiver denial and revocation of the job offer by contending defendant violated Department of Defense ("DoD") regulations when he refused to honor plaintiff's valid security clearance. As has been discussed, this argument is fallacious because plaintiff has not demonstrated he had the necessary level of security clearance required for the job and because the DoD regulations cited are inapplicable. He also suggests pretext based on the consideration of some negative information which occurred prior to the 2000 investigation. However, given the difference in the scope of the two investigations and the forms upon which they were based (SF-86, which defendant indicates included information as to police record and financial delinquencies, versus SF-85, which did not), consideration of that information does not

suggest pretext.[16]

Plaintiff also suggests that the negative information listed by Stepp and considered by Bradley would not warrant a denial of a security clearance, citing his Exhibit 17, which he indicates is part of the Defense Department's security regulations. However, that exhibit specifically notes that a history of not meeting financial obligations is among the conditions which "could raise a security concern and may be disqualifying...."

The question, of course, is not whether Bradley was correct in concluding that plaintiff would have trouble ultimately securing the necessary clearance or whether Bradley was correct in his assessment of the potential burden of starting an employee whose tenure might be cut short by an unfavorable final decision on a security clearance. Those are business judgments the court will not second guess. Rather, the question is whether those considerations were the basis for the decision or whether the basis was race, an impermissible consideration.[17] *See generally* Garrison, 428 F.3d at 938 ("we 'will not second guess business decisions made by employers, in the absence of some evidence of impermissible motives'") (quoting Lucas v. Dover Corp., 857 F.2d 1397, 1403-04 (10th Cir. 1988). Here, given the negative information reflected in plaintiff's SF-86, there is nothing to suggest that Bradley's assessment of plaintiff's background information was so obviously wrong as to suggest pretext in relying on that information to deny the waiver.

Plaintiff argues that, as the various aspects of the hiring process that he objects to

---

[16]*Defendant states in his reply brief that the SF-85 does not request information from the applicant about his police record or financial delinquencies. Defendant's reply, p. 11.*

[17]*Similarly, the court rejects the Secretary's suggestion it should accord defendant's hiring decision special deference because it involved national security. Here, the issue is not whether the clearance level assigned to the particular position was appropriate or whether plaintiff qualified for a particular security clearance. If it was, deference to the Secretary would no doubt be appropriate  Rather, the issue here is whether the hiring decision was made based on security issues (however reasonably or unreasonably they might have been resolved) or whether it was based on race.*

occurred after the incident with Mobley, discrimination or pretext is shown. However, the evidence is undisputed that neither Bradley nor Stepp had met plaintiff or were aware that he was black at the time the decision was made.[18] Plaintiff contends that Mobley's knowledge of his race and alleged racial animus should be imputed to Bradley, who was Mobley's superior, and to Stepp, who worked for him. He fails, though, to offer any evidence that Mobley was involved in the decision-making process. *See generally* English, 248 F.3d at 1010 (to meet pretextual burden plaintiff must show nexus between circumstantial evidence of decisionmaker's racial prejudice and employment decision).

This is not a situation where the decisionmaker was provided false information or only partial information. It is not a situation where plaintiff has demonstrated "'that the decisionmaker followed the biased recommendation [of a subordinate]'" without an independent investigation. English, 248 F.3d at 1011 (quoting Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir.1999). There is no evidence that the allegedly biased subordinate had any involvement in the decision-making process. The 'cat's paw' doctrine under which "a defendant may be held liable for a subordinate employee's prejudice even if the manager lacked discriminatory intent," *id.* at 1011, is therefore inapplicable. Plaintiff also has not proffered any other evidence as to the handling of the waivers demonstrating pretext, such as a showing that other applicants who sought waivers were treated differently.[19]

---

[18]*See Plaintiff's objection, p. 7, ¶18 ("It is true that Eldon Stepp never met Plaintiff, however, Eldon Stepp's supervisor, Eulis Mobley, personally met Plaintiff.").*

[19]*Stepp and Bradley both attested that the decision-making process followed in considering whether to grant plaintiff a waiver was the same as that used with respect to all applicants. While their conclusory statements might not suffice to controvert any specific instances of differential treatment offered by plaintiff, he failed to come forward with any evidence to create a material fact dispute on this point.*

11

The circumstances upon which plaintiff rely, [20] considered either individually or cumulatively, are not sufficient to create a triable issue of pretext.

The court is not without sympathy for plaintiff, given the end result of this process. He gave up one job with the hope and expectation, perhaps reasonable, that he had a new job in hand. However, the combination of a somewhat ambiguous Memorandum, coupled with confusion as to process and plaintiff's status, does not translate into discrimination based on race. In the circumstances existing here, plaintiff has failed to put forward evidence sufficient to permit a trier of fact to disbelieve defendant's legitimate, nondiscriminatory reason for his decision.

Accordingly, defendant's motion for summary judgment [Doc. #18] is **GRANTED**.

**IT IS SO ORDERED**.

Dated this 3rd day of February, 2006.

JOE HEATON
UNITED STATES DISTRICT JUDGE

---

[20]Plaintiff also alludes to conflicting positions during the hiring process as to whether he qualified for a VRA transfer or not. However, that issue, which was ultimately resolved in his favor, was not the basis for the decision not to grant a pre-employment waiver and hire him. See Plaintiff's Exhibit 13, p. 37. Similarly, plaintiff argues the setting of a start date for him meant he had passed all the requirements and the subsequent conclusion to the contrary was pretextual. As noted previously, however, the February 10, 2003, Memorandum tied the setting of a start date to the completion and mailing of the investigation paperwork, not the completion of the clearance process. While the Memorandum is not a model of clear drafting, its language, coupled with the circumstances here, does not suggest that defendant's insistence on the various security standards was pretextual.